[No. A069178. First Dist., Div. Two. May 21, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRELL COLLINS, Defendant and Appellant.

854

**COUNSEL**

Janice M. Brickley, under appointment by Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Christina V. Kuo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

This novel case arises out of the postsentencing revocation of defendant's initial plea bargain agreement and his commitment to the California Youth

Authority in accordance with that agreement. We are called upon to decide whether: (1) the trial court had jurisdiction to rule upon the district attorney's motion to revoke defendant's plea bargain agreement and conforming sentence; (2) the district attorney waived his right to nullify the plea bargain agreement; (3) statements made by the defendant pursuant to the plea bargain agreement were properly admitted during the hearing on the district attorney's revocation motion; and (4) initial trial counsel rendered ineffective assistance to defendant. Upon considering these issues, we reject defendant's claims and affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *May-August 1992: Defendant Is Charged With Martin's Murder*

Drew Martin's body was found inside his apartment on May 23, 1992. Martin's head was bound with cloth and tape, and the apparent cause of death was blunt trauma and asphyxiation. A baseball bat and a jammed rifle were found near the body and a fannypack belonging to Martin was found outside an open window. Several residents of the complex reported seeing one or two Black males at or near Martin's apartment the previous Wednesday or Thursday, one of whom loaded property into and drove away in Martin's car.

Witnesses identified Christopher Johnson (Johnson) as one of the two people who entered Martin's apartment and as the person who loaded and drove Martin's car. One witness identified defendant as someone who was standing on Martin's balcony either that Wednesday or Thursday.

Johnson was arrested on June 2, 1992, and denied any involvement in the offense.

On July 14, 1992, while defendant was in custody on an unrelated charge, Detective William Thompson (Thompson) attempted to question defendant regarding the Martin homicide. Defendant, however, asserted his *Miranda*[1] rights and did not give a statement.

Thompson interviewed Denise Coretjer (Coretjer), defendant's cousin, on August 5, 1992. She told him that defendant was present when Johnson killed Martin, but that defendant did not participate in the murder.

---

[1] See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

A petition, pursuant to Welfare and Institutions Code section 602, was filed against defendant on August 7, 1992.[2] The petition alleged the following counts relating to the Martin homicide: one count of murder (Pen. Code, § 187, subd. (a)[3]) with special circumstances of robbery (§ 190.2, subd. (a)(17)(i)) and torture (§ 190.2, subd. (a)(18)), one count of robbery of an inhabited dwelling (§ 212.5, subd. (a)), and one count of torture (§ 206).

B. *September 1992: Defendant and the Prosecution Explore the Possibility of a Plea Bargain*

Assistant District Attorney Jack Grandsaert (Grandsaert) and defendant's first attorney, Peter Goldscheider (Goldscheider), entered into a letter agreement on September 11, 1992, whereby defendant agreed to speak with the prosecution regarding Martin's murder, in order "to assess the credibility and value of the evidence and possible testimony" that defendant might be able to provide and to assist the prosecution "in determining what, if any, offer [it] would be willing to make" to defendant. Goldscheider told defendant that Grandsaert wanted to see what type of witness defendant would make and to satisfy himself that defendant was not more involved in the crime than had been represented. Goldscheider also advised defendant that he had a good chance of being found unfit for juvenile court and thus would be facing life without the possibility of parole if convicted of the murder.

Pursuant to this letter agreement, Grandsaert interviewed the defendant on September 14, 15 and 16, 1992. During these interviews defendant said that he went to Martin's house with Johnson to get some marijuana. While there, Johnson unexpectedly hit Martin on the head with a baseball bat rendering him unconscious. Johnson then bound Martin with tape and a pillowcase, dragged him to the back room, beat him with a baseball bat and choked him with a wire. Defendant denied taking part in the assault, other than checking to see if Martin was dead and watching Martin's unconscious body as Johnson carried property out to the car. Defendant fled through a window and walked up a hill to a street, where he encountered Johnson, who ordered him to get into Martin's truck. When they arrived at Coretjer's apartment, Johnson carried the stolen property into the apartment. Defendant told Coretjer what had happened while the two of them were alone.

Following these statements, defendant took and passed a polygraph examination.

---

[2]Defendant's date of birth is October 23, 1974. He was 17 years old on the date of the homicide.

[3]All further statutory references are to the Penal Code unless otherwise indicated.

Although defendant added more self-incriminating detail to his story at each of the three interviews,[4] the prosecution agreed to enter into a plea agreement with him.

## C. *October 1992: Defendant Enters Into a Plea Bargain Agreement*

A formal plea bargain agreement between defendant and the district attorney was executed on October 16, 1992. (A copy of the plea bargain agreement is attached as appendix A.) Defendant agreed to cooperate with law enforcement and the prosecution in the investigation and prosecution of the murder of Martin, including providing truthful and complete statements and testimony concerning the actions and criminal offenses of all persons involved in the murder, including himself. In exchange, the district attorney agreed to reduce the charges against defendant to a single count of accessory after the fact (§ 32) and to agree to a juvenile commitment to the California Youth Authority (CYA).

The agreement expressly stated that defendant's CYA commitment was conditional upon his continuing performance of "all of the terms of the Agreement" and provided that, if he testified untruthfully, the "entire Agreement is null and void." The effects of nullification of the agreement were then spelled out as follows: "(1) That the Minor [defendant] will be deemed to have withdrawn his admission of guilt, (2) The original charge will be automatically reinstated with no limitation on possible sentence or degree of murder, (3) The Minor will be returned to San Mateo County to face prosecution on the original charge, and, (4) The District Attorney's Office will be free to seek a finding of unfitness against the Minor."

The agreement was signed by defendant, Goldscheider and Grandsaert. In response to the trial court's inquiries, defendant stated that he understood all of the terms of the agreement. The trial court accepted the agreement and committed to sentence defendant to a maximum of five years in CYA in accordance with its terms.

Pursuant to the agreement, defendant testified for the prosecution at the preliminary hearing in Johnson's case. His testimony was consistent with his September statements.

---

[4]During the first interview, defendant stated that Johnson had committed the murder and that he was merely an accessory after the fact. Defendant denied that he had hit, dragged or bound Martin. He never mentioned a preconceived plan to burglarize the apartment.

During the second interview, defendant stated for the first time that he had watched over the victim while Johnson carried property out of the apartment. Defendant also added that Johnson hit Martin with a rifle found in the apartment.

During the third interview, defendant admitted that he had "lied" during the previous interviews and added more details about the murder. He then stated that he was telling the "whole truth at that time." Defendant continued to deny that he personally assaulted Martin.

At his dispositional hearing, defendant requested immediate sentencing, rather than continuing the hearing until after the Johnson case concluded. Goldscheider noted that the polygraph test supported defendant's claim "he didn't play any active role in the incident." Grandsaert stated that, since defendant had apparently testified truthfully at the preliminary hearing, he had "complied" with the plea bargain to date. Grandsaert argued that, although defendant was present during the crime, he was only involved as an accessory. Pursuant to the agreement, the trial court declared defendant a ward of the court and ordered him committed to CYA for the recommended term of five years.

## D. *March-April 1993: Defendant Talks to Thompson*

On March 30, 1993,[5] Thompson learned that Coretjer had told an investigator for the district attorney's office that defendant had lied to the police and that he had admitted to kicking Martin in the groin during the fatal attack. Based on this new information, Grandsaert requested that Thompson again interview defendant. Grandsaert telephoned Goldscheider to describe the new information and to inform him of Thompson's pending interview.

Thompson interviewed defendant at CYA on April 1. During this interview, defendant admitted that he had lied at the preliminary hearing and all the prior interviews. Defendant told Thompson that he and Coretjer had fabricated his story, that defendant and Johnson had gone to the apartment to commit a burglary, that he stayed during the attack on Martin in order to complete the robbery, that Marc Dailey was at Coretjer's house when defendant and Johnson returned from Martin's apartment, and that he had carried property into Coretjer's apartment.

Grandsaert spoke with Thompson after the interview. Grandsaert then contacted Goldscheider. Grandsaert told him about defendant's admissions and stated that he had not decided what he was going to do about the status of the plea bargain. He stated that, at a minimum, defendant would have to serve some additional time for perjury in order to remain a viable witness. At no time did Goldscheider object to the interview.

Based on the information received from Coretjer and defendant, Marc Dailey was arrested on charges of being an accessory after the fact, interviewed by Thompson, and granted immunity.

## E. *April 1993: Defendant Talks to an Investigator for Johnson*

On April 2, Johnson's investigator, Richard Gouveia (Gouveia), went to CYA to speak to defendant about the information elicited during the April 1

---

[5]Unless otherwise noted, all subsequent dates are in 1993.

interview with Thompson. Defendant told Gouveia that he wanted to speak with Thompson before talking to him, because he was concerned about how the conversation would affect his plea agreement. Gouveia told Thompson of defendant's concerns; Thompson replied that defendant could talk to Gouveia if he wanted, but that he did not have to talk to Gouveia. Gouveia conveyed this message to defendant on April 8. Defendant then submitted to interviews with Gouveia on April 8 and April 13.

During these two interviews, defendant told Gouveia the same version of events that he had told Thompson on April 1. The only additional fact defendant added was that when Johnson asked him for a pillowcase during the attack, he threw it to him. When describing how he reacted when Martin fell against him, defendant first used the word "punch" before correcting himself to say he "threw" Martin off of him as he had told Thompson.

The prosecution learned the contents of these interviews sometime before July 20. Goldscheider learned of the interviews after they occurred.

F. *July 1993: Grandsaert, Thompson and Johnson's Investigator Interview Stefan Jones*

Sometime around July 14, 1993, Grandsaert learned that an in-custody informant, Stefan Jones, claimed that defendant had made admissions to him relating to the Martin murder. Grandsaert informed Goldscheider of his intention to interview Jones and Goldscheider asked to attend. On July 20, Grandsaert, Thompson and Gouveia interviewed Jones at CYA; Goldscheider, however, was unable to attend because of a conflicting court appearance. Jones told them that defendant admitted to grabbing Martin from behind with a telephone wire and choking him until he was dead. According to Jones, defendant also admitted that he had helped drag Martin to the back of the apartment and had taken $2,000 and some gold items from the apartment. Jones further reported that defendant and Coretjer had fabricated a story to shift blame to Johnson.[6]

G. *July 1993: Grandsaert and Thompson Interview Defendant*

On July 22, Grandsaert informed Goldscheider that he was going to interview defendant about the allegations of Jones and others. Again, Goldscheider voiced no objection. On July 23, Grandsaert and Thompson interviewed defendant at CYA. Grandsaert told defendant that he knew

---

[6]The trial court knew Jones by reputation and ruled that he was a totally incredible source of information. Therefore, the trial court did not credit any of this information in its ruling revoking the sentence and plea.

defendant had not been truthful in previous interviews and that the purpose of the interview was to see if the agreement could be saved. After Grandsaert stressed the importance of telling the complete truth, defendant admitted that Martin and Johnson had "boxed." Defendant also admitted that he fought with Martin and helped drag Martin to the back room. He further acknowledged that Dailey and two teenage boys were at Coretjer's apartment when Johnson admitted that he had killed Martin.

As he left CYA, Thompson told defendant's CYA counselor that defendant should be moved to a tighter security facility, because defendant had received information from Grandsaert that suggested defendant was now an increased security risk.

### H. *July-August 1993: the Prosecution Asserts a Breach*

On July 26, Grandsaert informed Goldscheider that he could not use defendant as a witness and that he would move to resume prosecution. Goldscheider responded that he would have to declare a conflict and withdrew from the case. Thereafter, defendant was represented by Attorneys Richard Halpern and John Halley.

On August 26, the district attorney's motion to dismiss Johnson's case was granted. Johnson was held to answer for a second time at a preliminary hearing on September 13, a hearing at which the statements obtained from Marc Dailey were placed in evidence through the testimony of Thompson. Thompson testified that none of defendant's statements about the crime were used at the second preliminary hearing.

On August 10, the prosecution moved to set aside defendant's plea bargain agreement and sentence, resume juvenile proceedings and set a fitness hearing to determine whether defendant should be tried in adult court. An evidentiary hearing on the motion commenced on September 20. On September 23, the trial court granted the prosecution's motion to set aside the plea bargain agreement, finding that defendant had materially breached the agreement by giving false testimony at the preliminary hearing of Johnson. The court then reinstated the August 1992 petition and referred the matter back to the juvenile court for the setting of a fitness hearing.

On October 15, defendant filed a petition for writ of mandate and/or prohibition in this court (A063407). We issued a summary denial on October 20.

### I. *October 1993-January 1995: Defendant Enters a Subsequent Plea and Is Resentenced*

By indictment of the grand jury, on October 19 defendant was charged with one count of murder (§ 187), with special circumstances allegations of

robbery (§ 190.2, subd. (a)(17)(i)), burglary (§ 190.2, subd. (a)(17)(vii), and torture (§ 190.2, subd. (a)(18)), one count of robbery in an inhabited dwelling (§ 212.5, subd. (a)), one count of residential burglary (§ 460, subd. (a)), one count of conspiracy to commit burglary (§ 182.1), one count of torture (§ 206), and one court of perjury (§ 118).

The trial court held a fitness hearing on October 21 and found that defendant was unfit for juvenile court.

On May 13, 1994, defendant pled no contest to an amended indictment alleging voluntary manslaughter (§ 192, subd. (a)), three counts of second degree burglary (§ 460, subd. (b)), five counts of assault with a deadly weapon or force likely to cause great bodily injury (§ 245 subd. (a)(1)), three counts of receiving stolen property (§ 496), three counts of grand theft (§ 487.1), one count of perjury (§ 118), and one count of auto theft (Veh. Code, § 10851, subd. (a)).

On November 4, 1994, the superior court, sitting as a juvenile court, vacated defendant's CYA commitment.

On January 26, 1995, after obtaining a diagnostic report from the CYA (Welf. & Inst. Code, § 707), the trial court imposed a 21-year state prison sentence, with 1,131 days credit for time served.[7]

Defendant filed a timely notice of appeal on February 24, 1995. The superior court issued a certificate of probable cause pursuant to section 1237.5, subdivision (a), on March 7, 1995.

---

[7]Defendant's prior history with the juvenile authorities included the following:

On June 3, 1987, the San Francisco juvenile authorities twice detained defendant, then age 11, for extorting money from children at school, but released him to his mother's custody.

On March 13, 1990, the San Mateo County District Attorney filed a petition charging defendant with several counts of auto theft and misdemeanor trespassing, his third and fourth such arrests within three years. After defendant admitted one auto theft charge, the court dismissed the remaining charges, sustained the petition, and recommended defendant be committed for the maximum term of three years. The case was transferred to San Francisco County for disposition. A bench warrant subsequently issued for defendant's failure to appear at a hearing.

On April 3, 1992, a subsequent San Mateo County petition charged defendant with burglary, receiving stolen property, and possession of stolen property. After defendant admitted the charge of receiving stolen property, the juvenile court dismissed the remaining charges and sustained the petition. The court recommended commitment for three years and eight months, ordered defendant detained at juvenile hall, and transferred the case to San Francisco County.

On July 2, 1992, another subsequent San Mateo County petition charged defendant with burglary, petty theft, and giving false identification to a police officer. After defendant admitted the burglary charge, the juvenile court sustained the petition and recommended a maximum commitment of four years and nine months. After the case was transferred to San Francisco County for disposition, defendant was released on probation.

## III. Discussion

### A. *Jurisdiction to Vacate Defendant's Sentence and Plea*

Defendant contends that the trial court lacked jurisdiction to decide the district attorney's motion to resume proceedings against him. In support of his argument, defendant relies upon both lack of specific statutory authorization for such a postconviction motion by the prosecution and the general rule that, with certain exceptions,[8] once a facially valid sentence has been entered into the minutes of the court or the defendant has begun serving the sentence, the court is without power to vacate, add to, or modify the sentence imposed. (E.g., *People* v. *Karaman* (1992) 4 Cal.4th 335, 339 [14 Cal.Rptr.2d 801, 842 P.2d 100].) This rule applies to juvenile commitments as well. (*In re Eugene R.* (1980) 107 Cal.App.3d 605, 612 [166 Cal.Rptr. 219], disapproved on other grounds in *In re Ricky H.* (1981) 30 Cal.3d 176, 185-190 [178 Cal.Rptr. 324, 636 P.2d 13]; cf. *In re Owen E.* (1979) 23 Cal.3d 398, 405 [154 Cal.Rptr. 204, 592 P.2d 720] [trial court may not vacate order of commitment to CYA because court's view of minor's needs differs from CYA determinations].)

Defendant has constructed his argument around the wrong question. The relevant question is not whether the trial court had jurisdiction to reconsider the sentence imposed but, rather, whether the trial court had jurisdiction to consider a motion to vacate a judgment that was specifically conditioned upon the validity of a plea bargain agreement which, in turn, was expressly conditioned upon defendant's truthfulness.

Both our state Supreme Court and the United States Supreme Court have recognized that plea bargaining is based upon "reciprocal benefits" or "mutuality of advantage" between the prosecution and the defendant. (E.g., *People* v. *Collins* (1978) 21 Cal.3d 208, 214 [145 Cal.Rptr. 686, 577 P.2d 1026]; *Brady* v. *United States* (1970) 397 U.S. 742, 752 [25 L.Ed.2d 747, 758-759, 90 S.Ct. 1463].) Our Supreme Court has repeatedly recognized that " '[w]hen a guilty plea . . . is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties . . . must abide by the terms of the agreement.' " *(People* v.

---

[8]These exceptions are not relevant here. We specifically note, however, that one such exception is extrinsic fraud. (*People* v. *Kirkpatrick* (1991) 1 Cal.App.4th 538, 543-545 [3 Cal.Rptr.2d 213].) Because the existence of fraud is a factual question that was neither raised nor adjudicated in the trial court, we do not decide whether this exception could have been invoked under the circumstances of this case. We observe, however, that various federal courts have recognized a "fraud exception" to the rule that a judge is bound to carry out a plea agreement once he or she has accepted it. (*U.S.* v. *Partida-Parra* (9th Cir. 1988) 859 F.2d 629, 634, fn. 6, and cases cited therein.)

*Panizzon* (1996) 13 Cal.4th 68, 80 [51 Cal.Rptr.2d 851, 913 P.2d 1061], quoting *People* v. *Walker* (1991) 54 Cal.3d 1013, 1024 [1 Cal.Rptr.2d 902, 819 P.2d 861].) Accordingly, "[w]hen either the prosecution or the defendant is deprived of benefits for which it has bargained, corresponding relief will lie from concessions made." (*People* v. *Collins, supra*, 21 Cal.3d at p. 214.) "[Federal] cases suggest that courts have some remedial power to enforce plea bargains." (*U.S.* v. *Partida-Parra, supra*, 859 F.2d at p. 633, and cases cited therein; see also 2 LaFave & Israel, Criminal Procedure (1984) Pleas of Guilty, § 20.2, p. 595 & (1991 supp.) p. 202 [reviewing federal and sister-state cases].) Although the parties have not cited, and our independent research has not revealed, any decisions from the courts of this state that are directly on point, we conclude that our state law supports the existence of remedial power to act upon a postconviction petition brought by either the defendant or the prosecution to enforce the terms of a plea bargain agreement.

█ It is well established in California that, despite the lack of statutory authority for such a proceeding, a defendant, after judgment, may seek to enforce the terms of a plea bargain by bringing a motion to vacate the judgment or a petition in the nature of a writ of *coram nobis*. (E.g., *People* v. *Wadkins* (1965) 63 Cal.2d 110, 113-114 [45 Cal.Rptr. 173, 403 P.2d 429]; 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Judgment and Attack in Trial Court, §§ 3120, 3124, pp. 3850-3852, 3856-3858; 5 Erwin et al., Cal. Criminal Defense Practice (1995) § 100.30, pp. 100-43 to 100-44; § 102.20, pp. 102-65 to 102-71.) █ While we have found no published California case addressing such a postjudgment motion or petition brought by the prosecution, we perceive no reason to hold that the courts of this state lack jurisdiction to entertain and rule upon such a motion or petition.

The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement in a situation where the party is deprived of the benefit of the bargain. (*People* v. *Collins, supra*, 21 Cal.3d at pp. 214-215; see also *People* v. *Mancheno* (1982) 32 Cal.3d 855, 860 [187 Cal.Rptr. 441, 654 P.2d 211] [either defendant or the People may seek specific performance of a plea bargain agreement].) In cases such as the present one, where a defendant's failure to comply with his bargain comes to light after execution of the sentence, the enforcement mechanism necessarily must be a postconviction attack on the judgment. (See *United States* v. *Verrusio* (7th Cir. 1986) 803 F.2d 885, 888-890 [89 A.L.R.Fed. 733] [upholding revocation of plea bargain and reindictment after defendant completed serving sentence imposed pursuant to bargain].) Failure to hold a defendant to the terms of his bargain would undermine the integrity of the judicial process. In this case, defendant's breach of his

bargain included testifying falsely, conduct which is manifestly corrosive of our system of justice. There is no question that courts have inherent authority to protect the integrity of the judicial process. (See *U.S.* v. *Britt* (8th Cir. 1990) 917 F.2d 353, 355, fn. 2 [granting government's motion to vacate guilty plea brought prior to sentencing fell "well within (the court's) inherent power to protect the integrity of the judicial process"].)

Moreover, unlike other possible scenarios where a collateral attack on the judgment by the prosecution would raise double jeopardy concerns, in the case of a plea bargain the agreement is often structured to avoid double jeopardy defenses. Exactly that was done in this case: pursuant to the terms of the plea bargain that he entered, defendant waived any double jeopardy defense. (Cf. *Ricketts* v. *Adamson* (1987) 483 U.S. 1, 9-10 [97 L.Ed.2d 1, 11-12, 107 S.Ct. 2680].[9])

We discern no policy, procedural or substantive, that should bar the court from entertaining a prosecution motion or petition to vacate a judgment in the event of a breach of the plea bargain agreement in the same manner that it would entertain such a motion brought by a defendant based upon a breach by the prosecution.

■ Finally, even if we were to assume that defendant is correct that the court lacked power to act upon the prosecution's motion for the reasons that he urges, we conclude that defendant is estopped from raising the court's lack of jurisdiction to act. While it is patently true that "if a court is without jurisdiction, no amount of consent or estoppel can bestow it" (*People* v. *Dethloff* (1992) 9 Cal.App.4th 620, 625 [11 Cal.Rptr.2d 814]), this rule applies only to subject matter jurisdiction, which was clearly present in this case. (*In re Griffin* (1967) 67 Cal.2d 343, 346-348 [62 Cal.Rptr. 1, 431 P.2d 625]; 4 Witkin & Epstein, Cal. Criminal Law, *supra*, Jurisdiction and Venue, §§ 1823, 1829, pp. 2159-2160, 2166.) "When, as here, the court has jurisdiction of the subject, a party who seeks or consents to action beyond the court's power as defined by statute or decisional rule may be estopped to complain of the ensuing action in excess of jurisdiction. [Citations.]" (*In re Griffin, supra*, 67 Cal.2d at p. 347; see also *Law Offices of Stanley J. Bell* v. *Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1021-1024 [43 Cal.Rptr.2d 717].)

Here, defendant specifically agreed that any juvenile commitment pursuant to his plea bargain agreement was "conditional" upon "continued"

---

[9]While the *Ricketts* decision does support the Attorney General's position, it by no means provides, as the Attorney General mistakenly urges, the entire answer to the novel question raised by the defendant.

performance of the terms of the agreement. Moreover, defendant further agreed that, in the event that he testified untruthfully, the agreement would be null and void and the parties would return to the status quo ante. Implicit in this agreement is a hearing (mandated by due process considerations) to determine if defendant breached his plea bargain agreement. (E.g., *United States* v. *Verrusio*, *supra*, 803 F.2d at pp. 888-890.) Under these circumstances, defendant is estopped from contesting the court's jurisdiction to act. " 'To hold otherwise would permit the [defendant] to trifle with the courts.' " (*In re Griffin*, *supra*, 67 Cal.2d at p. 348, quoting *City of Los Angeles* v. *Cole* (1946) 28 Cal.2d 509, 515 [170 P.2d 928], overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672 [312 P.2d 680].) Our determination that defendant is estopped is "in harmony with the proper operation" of the plea bargaining system. (*In re Griffin*, *supra*, 67 Cal.2d at p. 348.)

For these reasons, we reject defendant's jurisdictional claim and proceed to examine the trial court's rulings on the merits.

## B. *Defense of Waiver and Estoppel*

■ Defendant next contends that the prosecution waived his breach by failing to timely assert it and by continuing to accept the benefits of the agreement and is thereby estopped from revoking the agreement. The trial court made detailed findings rejecting these defenses. Ordinarily, the existence of waiver and estoppel are questions of fact and, as a consequence, the trial court's determination is binding on the appellate court if it is supported by substantial evidence. (*Long Beach Unified Sch. Dist.* v. *State of California* (1990) 225 Cal.App.3d 155, 171 [275 Cal.Rptr. 449] [waiver]; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 151 [135 Cal.Rptr. 802] [waiver and estoppel].) We conclude that the trial court's findings are supported by the record.[10]

As the trial court found, the district attorney knew of the defendant's untruthful testimony on April 1, 1993, the day he admitted it. The trial court concluded that the district attorney asserted the breach on April 2, when Grandsaert telephoned Goldscheider to inform him of the breach and then discussed whether the plea bargain agreement would be modified (by the addition of a plea to a count of perjury) or rescinded. The trial court further determined that the delay until July 23 in deciding that the breach required

---

[10]We are baffled by the Attorney General's cursory assertion that all of defendant's claims on the merits must be deemed waived because they were not expressly preserved in the plea bargain agreement. The Attorney General's decision to relegate the discussion of all of these issues, including waiver and estoppel, to a single paragraph placed in a footnote provided little, if any, assistance to the court in deciding this case.

nullification of the plea bargain agreement was neither unreasonable nor prejudicial. The trial court reasoned that, until that date, Grandsaert, at the urging of Goldscheider, continued to explore whether the agreement could be salvaged by modification. During the July 23 interview, Grandsaert concluded that the false testimony and statements by defendant were so substantial that he could not ascertain the entire truth and could not use defendant as a witness. Each of these findings is supported by substantial evidence in the record.

Defendant relies upon *U.S. v. Vogt* (8th Cir. 1990) 901 F.2d 100 in support of his claim that the four-month delay between knowledge of the breach and assertion of nullification resulted in a waiver. In *Vogt*, the federal court of appeals upheld the trial court's denial of the government's motion to vacate the defendant's plea bargain agreement. In that case, the government waited 10 weeks to vacate the plea bargain agreement after learning of the breach. The decision in *Vogt*, however, does not rest solely upon the length of time between knowledge of and assertion of breach. A crucial consideration was the government's "continued acceptance of the plea agreement's benefits" during the delay. (*Id.* at p. 102.) During that 10-week period, the government required the defendant to appear 3 times and testify twice before a grand jury. (*Ibid.*)

Defendant contends that the prosecution continued to accept the benefits of the bargain during the four-month delay in this case in several ways. The trial court found only one possible way that the prosecution benefited during the delay and found any such benefit to be "minuscule." During the delay, Thompson arrested Marc Dailey. Thompson testified that, while defendant's April interview statements did contribute to his probable cause to arrest Dailey, during his questioning of Dailey Thompson confronted him only with information that Coretjer provided on March 30 and did not use information obtained from defendant. Under these circumstances, we agree with the trial court that, if this was the only benefit received, it was negligible and would not support finding a waiver of the breach.

Defendant, however, also contends that the prosecution continued to benefit from the bargain in other ways. First, defendant raises the district attorney's April and July 1993 interviews of him. Without the agreement, he contends, the district attorney would not have had access to him. The only information arising from these interviews that the prosecution is alleged to have pursued prior to seeking to void the agreement is the lead that Dailey was a witness. This information was, however, also provided by Coretjer. To the extent that these interviews may have elicited further admissions of untruthfulness by defendant in the course of performing under the agreement, we cannot conclude that such admissions are the type of benefit that

would support a finding of waiver. As the trial court found, these interviews were undertaken in an attempt to determine whether defendant's plea should be salvaged and were conducted with the knowledge of defendant's trial counsel, who had been informed about the uncertain status of the bargain.

Finally, defendant argues that the prosecution continued to benefit from the plea bargain by continuing to hold Johnson in custody during this time period based upon defendant's testimony at Johnson's preliminary hearing. Shortly after the district attorney moved to vacate defendant's sentence and plea, however, the Johnson case was dismissed and refiled. The delay in moving to dismiss and refile the Johnson case paralleled the district attorney's investigation of defendant's credibility and the resulting position with respect to both cases. Grandsaert kept Johnson's counsel informed of developments in the investigation. When Grandsaert determined that defendant was not a credible witness, he alerted Johnson's trial counsel and, after some negotiation over the proper method to do so, the district attorney dismissed and refiled the Johnson case.

As the trial court found, rather than benefiting the Johnson prosecution, defendant hindered and delayed it. We conclude that the trial court's finding that the prosecution did not waive defendant's breach of the plea bargain agreement is amply supported by the record.

Defendant also appears to contend that the prosecution is estopped from revoking the plea bargain agreement because it received substantial benefit from it. In support of this contention, defendant relies upon *People* v. *Brunner* (1973) 32 Cal.App.3d 908 [108 Cal.Rptr. 501]. Brunner, a "Manson family" member, received immunity conditioned upon truthful testimony about a homicide. In the first trial relating to that murder, she implicated herself and the defendant on trial. She later recanted in a motion for new trial filed by the defendant. The conviction, however, stood. In subsequent cases, Brunner denied involvement in the murder and asserted her privilege against self-incrimination. The prosecution considered the agreement breached and indicted Brunner. The appellate court ordered dismissal of the indictment, finding that the "People got their hoped-for results through the use of Brunner's testimony," and thus concluded, "albeit somewhat pragmatically, that enough of the bargain was kept to make it operative." (*Id.* at p. 916.)

We conclude that defendant's performance does not meet the *Brunner* criteria for establishing estoppel.[11] Defendant did not substantially perform the bargain. He lied at Johnson's preliminary hearing and the indictment

---

[11]For this reason, we need not attempt to harmonize *Brunner* with or choose between *Brunner* and federal decisions holding that rescission of a plea bargain agreement is an

obtained was subsequently dismissed. His perjury and continuing untruthfulness rendered him an unfit witness for Johnson's trial and actually hindered the investigation of the homicide. The evidentiary leads provided by his statements were available from other sources. We cannot conclude that the district attorney received so much benefit of the bargain that fairness mandates that it remain operative.

## C. Admission of Defendant's Statements

At the hearing to vacate defendant's sentence and plea, defendant objected to the admission of all postconviction statements made by him about the crime on the grounds that they were taken in violation of the terms of the agreement and in violation of his United States Constitution Fifth and Sixth Amendment rights. The trial court excluded the statements taken on September 14, 15 and 16, 1992, finding that the letter agreement of September 11, 1992, precluded their use at such a proceeding. The trial court rejected defendant's objections to all subsequent statements. Defendant now contends that the trial court erred in admitting these statements over his objections. Since defendant's statements of April 1 and July 23, 1993, to the prosecution constitute more than sufficient evidence to support the trial court's ruling herein, and since we conclude that these statements were properly admitted, we do not address the admissibility of the other challenged statements.

Prior to proceeding to the merits of defendant's claims, we feel obliged to observe that we are not called upon in this case to opine as to whether any of defendant's statements would have been admissible in either the prosecution's case-in-chief or as impeachment at a trial for crimes arising out of Martin's murder or for perjury. Our only concern is whether these statements were properly admitted at the hearing to revoke defendant's plea bargain agreement.

### 1. Involuntary Nature of Statements

■ Defendant contends that the April and July statements were the product of express and implied promises of leniency and therefore were involuntary and inadmissible. (E.g., *People* v. *Cahill* (1993) 5 Cal.4th 478, 482, fn. 1 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) We conclude that the statements were admissible for purposes of the revocation hearing.

We begin our analysis by observing a slight precedential tilt toward holding that, at least in the absence of an explicit contrary term in the plea

available remedy whenever the plea bargain is materially breached in any way. (*U.S.* v. *Gonzalez-Sanchez* (1st Cir. 1987) 825 F.2d 572, 579; *United States* v. *Simmons* (4th Cir. 1976) 537 F.2d 1260; *United States* v. *Nathan* (2d Cir. 1973) 476 F.2d 456, 459; *U.S.* v. *Packwood* (N.D.Cal. 1987) 687 F.Supp. 471, 474.)

bargain agreement, statements obtained as a result of cooperation under such an agreement are involuntary and therefore inadmissible to prove guilt of the crimes for which defendant was originally indicted. (*Gunsby* v. *Wainwright* (5th Cir. 1979) 596 F.2d 654, 656; *State* v. *Hanson* (1989) 181 W.Va. 353 [382 S.E.2d 547]; *People* v. *Jones* (1982) 416 Mich. 354 [331 N.W.2d 406]; *State* v. *Nall* (La. 1980) 379 So.2d. 731; but cf. *U.S.* v. *Knight* (11th Cir. 1989) 867 F.2d 1285, 1288, *United States* v. *Stirling* (2d Cir. 1978) 571 F.2d 708; see also *U.S.* v. *Mezzanatto* (1995) 513 U.S. __ [130 L.Ed.2d 697, 115 S.Ct. 797] [provisions of Federal Rules of Evidence, rule 410 and Federal Rules of Criminal Procedure, rule 11(e)(6) rendering inadmissible statements made in the course of unsuccessful plea bargain negotiations may be waived]; *Groover* v. *State* (Fla. 1984) 458 So.2d. 226 [explicit use term in plea bargain agreement]; *State* v. *Lewis* (La. 1989) 539 So.2d 1199 [90 A.L.R.4th 1117] [explicit no-use term in plea bargain agreement].) However, and as we stated in the preceding section, we are not called upon to decide this particular question in this case. We believe that significant differences exist between using statements given by a defendant in the course of performing his plea bargain agreement to prove breach of that agreement and using such statements as evidence of guilt of a crime at trial.

Accepting for the sake of argument defendant's premise that the plea bargain agreement rendered his statements involuntary, we observe that all of his statements were made pursuant thereto, including his perjurious testimony at Johnson's preliminary hearing. If all of these statements are inadmissible, then there would be no way whatsoever for the prosecution to prove a breach by defendant of his obligation to testify truthfully. That cannot be the case.

The parties' relationship while the plea bargain remains in effect is essentially a contractual one. (*U.S.* v. *Partida-Parra, supra,* 859 F.2d at p. 633, and cases cited therein.) As the trial court must conclude when accepting a plea entered into pursuant to such an agreement, the arrangement is voluntary. Where the agreement specifies cooperation, defendant's cooperation is voluntarily given in exchange for the leniency granted while the agreement remains in effect. It is only when the state withdraws from the bargain and seeks to hold defendant answerable for the crimes contained in the original indictment that defendant's statements induced by the bargain could be viewed as involuntary, if it is determined that defendant would not have made those statements without the promised inducement. This result is required in order to deter potential abuse of the plea bargain system.

However, neither the values that underlie the prohibition of the use of involuntary confessions nor the proper functioning of the plea bargain

system would be served by the exclusion of statements given in the course of performance of a plea bargain agreement from a hearing on whether that agreement was breached. As the United States Supreme Court has explained, involuntary confessions are prohibited because "ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [5 L.Ed.2d 760, 766, 81 S.Ct. 735]; cf. *People* v. *Badgett* (1995) 10 Cal.4th 330, 347 [41 Cal.Rptr.2d 635, 895 P.2d 877] ["When the defendant seeks to exclude the fruit of the coerced statement of another, however, the policy of protecting the defendant from being compelled to aid the state in convicting him is not at stake."].) In the context of a breach hearing, however, the government is not seeking to prove defendant's guilt of a crime; rather, the government is seeking relief from a contractual agreement that the defendant has allegedly breached in order to return to the status quo ante and try the defendant. To rule such evidence inadmissible would not advance the goals and purposes of plea bargaining. In order for the system to function correctly, both sides of the bargain must perform its terms. (E.g., *People* v. *Collins, supra*, 21 Cal.3d at p. 214; *Brady* v. *United States, supra*, 397 U.S. at p. 752 [25 L.Ed.2d at pp. 758-759].) Permitting a defendant who confesses to materially violating the agreement to retain the benefits of bargain solely because his confession was made pursuant to his duty to cooperate under the agreement would be nonsensical and we decline to so hold.

In reaching this result, we do not ignore defendant's claim that the course of dealing between defendant and Grandsaert led him to believe that, if he told the truth when confronted by new evidence, his past lies would be forgiven and the bargain would remain intact. Rather, we conclude that the record does not support that claim and, in any event, the claim is irrelevant since defendant was required to tell the truth pursuant to his plea bargain agreement and any reminders of that fact could not be construed as an express or implied promise of leniency.

2. *The Fifth and Sixth Amendments*

■ Defendant next contends that the trial court erred by failing to suppress his statements because they were obtained in violation of his Fifth Amendment rights against self-incrimination and to assistance of counsel and his Sixth Amendment right to counsel. As defendant observes, and we have independently confirmed, there is a dearth of authority addressing defendant's constitutional rights in the postconviction context presented by this case.

Although we do not agree with the Attorney General's contention that *Ricketts* v. *Adamson, supra,* 483 U.S. 1, is totally dispositive of defendant's claim, we agree that it provides an instructive starting point for our analysis. In that case, the high court held that, despite the absence of an explicit waiver of the protections of the double jeopardy clause in a plea bargain agreement or at the hearing for acceptance of the plea, such a waiver was implicit in "equivalent" language of the agreement. (*Id.* at p. 10 [97 L.Ed.2d at pp. 11-12].) The high court opined that any other conclusion would render the agreement "meaningless." (*Ibid.*)

Reviewing defendant's agreement and the parties' subsequent actions pursuant thereto (1 Witkin, Summary of Cal. Law (9th ed. 1990) Contracts, § 689, pp. 622-623), we conclude that an implicit waiver of *Miranda* rights and Sixth Amendment counsel rights are included in the plea bargain agreement. Defendant pledged to provide "truthful and complete statements concerning the actions and criminal offenses of all persons involved in the murder of Drew Martin . . . , including . . . himself." His agreement to cooperate with the prosecution included "remain[ing] available to law enforcement agencies during the investigation and prosecution of persons involved in the murder of Drew Martin" and "testify[ing] truthfully and completely" in all related criminal proceedings. There is no question that defendant thereby waived his right to self-incrimination and agreed to truthfully provide information about the murder.

We further conclude that a waiver of the presence of counsel during interviews conducted pursuant to the plea bargain agreement is implicit in that agreement. Defendant, with the aid of his attorney, entered into an agreement whereby he would become an informant and witness for the prosecution, thus, in effect becoming a member of the prosecution team working to convict Johnson. As a matter of course, the defendant agreed to remain available to law enforcement without placing any restrictions (such as the presence of counsel) on that availability.

Consistent with this view of the parties' agreement, Goldscheider testified: "I certainly understood that at some point [the district attorney] would probably be speaking to him without my presence." In fact, the parties proceeded on this understanding. No objection was raised by Goldscheider or defendant when the district attorney prepared defendant for his testimony at Johnson's preliminary hearing. Similarly, Goldscheider did not object or insist on being present at either the April 1 or July 23 interviews, since he was of the opinion that these interviews were being conducted pursuant to the agreement. Likewise, the record does not indicate that defendant requested counsel during these interviews or sought to consult with counsel between the interviews.

We agree with the trial court that inclusion of explicit waivers of constitutional rights in the plea bargain agreement would have been preferable. However, in light of the purpose and terms of the agreement, we conclude that it is almost frivolous to contend that defendant retained rights to stand mute and request a lawyer during his performance of the bargain. Accordingly, we hold that the necessary waivers of defendant's *Miranda* and Sixth Amendment counsel rights are implicit in the plea bargain agreement.[12]

■ Anticipating this ruling, defendant further contends that the April and July interviews were beyond the scope of the plea bargain agreement. He argues that the interviews were not conducted for legitimate purposes under the plea bargain agreement but, rather, were conducted for the purpose of prosecuting defendant for perjury and murder. Therefore, he continues, new *Miranda* warnings were required and the interviews could not be conducted in the absence of counsel, because the relationship between the District Attorney and the defendant had again become adversarial.

With respect to the April interview, the record provides no support for defendant's claim. The information that prompted the interview was obtained from a witness whom both Goldscheider and Grandsaert agreed had substantial credibility problems. Defendant on the other hand had passed a polygraph examination verifying his version of the events. The information received related to Martin's murder and the prosecution reasonably investigated what impact the information might have on the case that it was building. One method of investigation used was to question defendant, who had agreed to answer questions relating to the murder, including his role in it. There is simply no support for an argument that the April interview was beyond the scope of the agreement and defendant's waiver of rights thereunder.

The July interview poses a closer question. By this time, the prosecution knew that defendant had breached the plea bargain and was considering whether to modify or revoke the agreement. Some penalty for perjury, whether by trial or an agreed upon increase in sentence, was contemplated. Again, Grandsaert informed Goldscheider in advance of the interview and received no objection. Both Goldscheider and Grandsaert believed that the interview was within the scope of the agreement and part of defendant's duty to cooperate thereunder.

---

[12]With respect to the Sixth Amendment claim, we further observe that the trial court found that Grandsaert advised Goldschieder of both of the interviews in question prior to their occurrence. This finding is supported by substantial evidence. We also note that defendant's Sixth Amendment right to counsel with respect to the later-filed perjury count had not yet attached. (E.g., *United States* v. *Gouveia* (1984) 467 U.S. 180, 187 [81 L.Ed.2d 146, 153-154, 104 S.Ct. 2292].)

We conclude that the trial attorneys were correct in their assessment. While the interview was custodial and confrontational, it was undertaken in an attempt to discover whether defendant could provide a truthful version of the events surrounding the murder which could legitimately form a basis for testimony at Johnson's trial. Such an inquiry was clearly contemplated by the agreement. The fact that defendant could lose the benefits of the bargain if he did not provide truthful statements and testimony was also contemplated by the agreement. The possibility that defendant could be prosecuted for perjury in the event that he testified untruthfully was intimately related to the explicit undertakings of the agreement and any investigation into the truthfulness of defendant's performance of the agreement necessarily implicated such a crime and falls within the waivers implied in the agreement itself. (Cf. *U.S.* v. *Roberts* (2d Cir. 1989) 869 F.2d 70, 74-75 [Sixth Amendment right to counsel waived by plea bargain; new *Miranda* warnings given when "the focus of [the prosecution's] efforts shifted from that of their continuing duty to aid in Roberts' cooperation under the plea agreement to that of investigators of a separate offense"].)

Furthermore, we observe that evidence taken in violation of the exclusionary rules set forth in *Miranda* is not inadmissible for all purposes. (*Harris* v. *New York* (1971) 401 U.S. 222, 224 [28 L.Ed.2d 1, 3-4, 91 S.Ct. 643].) It is firmly established that the prosecution may use a prior inconsistent statement to impeach the testimony of a voluntarily testifying defendant, even though the statement was obtained in violation of the prophylactic rules of *Miranda*. (E.g., *Harris* v. *New York, supra*, 401 U.S. at pp. 224-226 [28 L.Ed.2d at pp. 3-5]; *People* v. *May* (1988) 44 Cal.3d 309, 319 [243 Cal.Rptr. 369, 748 P.2d 307] [post-Proposition 8, federal rule set forth in *Harris* controls state prosecutions].) In such a case, the deterrent effect of the exclusionary rules are adequately implemented by prohibiting the government from using the statements as *substantive evidence of guilt. (United States* v. *Havens* (1980) 446 U.S. 620, 628 [64 L.Ed.2d 559, 566-567, 100 S.Ct. 1912]; see also *James* v. *Illinois* (1990) 493 U.S. 307, 312-313 [107 L.Ed.2d 676, 683-684, 110 S.Ct. 648].)[13]

We discern substantial similarities between a defendant who testifies in his own behalf at trial and a defendant who agrees to testify in aid of the prosecution pursuant to a plea bargain agreement. Both defendants accept the obligation to "speak truthfully and accurately." (*Harris* v. *New York, supra*, 401 U.S. at p. 225 [28 L.Ed.2d at p. 4].) If either fails to live up to this obligation, the government should be permitted to use the defendant's

---

[13]Recent California authority extends this reasoning to also permit the prosecution to impeach a testifying defendant with statements obtained in violation of his *Sixth Amendment* right to counsel. (*People* v. *Brown* (1996) 42 Cal.App.4th 461, 472-474 [49 Cal.Rptr.2d 652].)

inconsistent statements to attempt to demonstrate that breach. As the *Harris* court observed, "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Harris* v. *New York, supra*, 401 U.S. at p. 226 [28 L.Ed.2d at p. 5].)

Moreover, permitting the use of a defendant's admissions to prove breach of a plea bargain agreement would not undermine the deterrent functions of the exclusionary rules, because the government would not be using the defendant's statements as substantive evidence of guilt of any charged crime. Rather, the sole issue at a breach hearing is whether defendant's plea bargain should be rescinded and the government permitted to try him. On the other hand, exclusion of such statements would permit the defendant to profit from perjury and avoid punishment commensurate with the severity of the crimes for which he was originally charged. That would be, we submit, an unacceptable cost to pay for any incremental gain in conformance with *Miranda* principles that might possibly result from the exclusion of such statements from plea bargain revocation hearings. (E.g., *Oregon* v. *Hass* (1975) 420 U.S. 714, 722-723 [43 L.Ed.2d 570, 577-578, 95 S.Ct. 1215] [weighing incremental deterrence against policy not to countenance perjury].)

Accordingly, we conclude that neither defendant's Fifth nor Sixth Amendment rights were violated and that his statements were admissible for purposes of determining whether he breached the plea bargain agreement. We again emphasize, however, that we need not and do not address whether defendant's statements would have been admissible at trial either in the prosecution's case-in-chief or as impeachment, especially in connection with a perjury charge.

### 3. *Violation of Plea Bargain Agreement*

■ Defendant next asserts that the use of his statements in the revocation hearing violated the terms of the plea bargain agreement itself. Based upon our independent review of the contract and the evidence, we disagree.

Some additional background is necessary to our analysis of this claim. First, the plea bargain agreement itself is silent regarding under what circumstances defendant's statements could be used against him. The letter agreement entered into in anticipation of statements made in exploration of whether an agreement could be reached does, however, address the admissibility issue. It states that defendant's statements would be inadmissible "in the juvenile prosecution presently pending against him in case number

52095, or, (2) in any subsequent adult prosecution in San Mateo County Superior Court against your client for the murder of Drew Martin should your client be found unfit for juvenile court treatment. The only exception to this would be that if your client should later testify to facts that are inconsistent with what he tells us during his interview with us, the statements that he makes during the interview may be [sought to be] used, by the defense or the prosecution, to contradict and/or impeach any such later inconsistent testimony, pursuant to Ev.C. [*sic*] 1235." Defendant alleges that the understanding reached in the letter agreement continued to reflect the parties' expectations after the plea bargain agreement was executed. We believe defendant's assertion overstates the record.

During the hearing, Goldschieder testified that it was his understanding that any statements provided pursuant to the plea bargain agreement could not be used against defendant in the prosecutor's case-in-chief and arguably would be inadmissible for impeachment as well. This understanding was conveyed to defendant. Goldschieder testified that he did not contemplate a revocation proceeding and did not discuss with defendant the possibility that the statements could be used in other such proceedings.

The parties' understanding regarding the exclusion of defendant's testimony was that it would not be used in the prosecution's case-in-chief against defendant. Based upon Goldschieder's testimony and the fact the understanding was apparently arrived at in the pre-plea-bargain stage of the discussions where a revocation hearing would not normally be contemplated, the most reasonable construction of the "case-in-chief" referred to by Goldschieder is the presentation of evidence at any actual trial of charges brought against the defendant.

Our ruling is not inconsistent with *U.S.* v. *Escamilla* (9th Cir. 1992) 975 F.2d 568, which is relied upon by defendant. That case is clearly distinguishable in that it dealt with the use of defendant's statements taken pursuant to the plea bargain agreement at trial. Furthermore, the "unjust enrichment" theory relied upon by the court in that case actually favors admission of the statements in the present case. The *Escamilla* court reasoned that, by revoking the plea bargain agreement, the government had returned the parties to the status quo ante and that, therefore, it would be unjustly enriched if it were permitted to use the information obtained under the auspices of the plea bargain agreement. (*Id.* at p. 571.) Here, however, excluding defendant's statements from the revocation hearing would undermine the state's attempt to enforce the plea bargain agreement by returning the parties to the status quo ante and would assist the defendant in his attempt to retain the benefits of the bargain without complying with the agreement. Unlike the situation

presented to the *Escamilla* court, we are not confronted by any unfairness in the trial court's ruling permitting the use of defendant's statements during the revocation hearing.

Accordingly, we conclude that the trial court did not violate the terms of the plea bargain agreement by admitting defendant's statements into evidence at the revocation hearing.

## D. *Ineffective Assistance of Counsel*

 Finally, defendant contends that Goldscheider provided ineffective assistance of counsel by failing to advise defendant in connection with the prosecution's investigation of the breach of the plea bargain agreement. We need not address the extent to which defendant was entitled to assistance of counsel in this postconviction context or, if so, whether Goldscheider provided effective assistance, because, assuming the correctness of defendant's proffered version of effective assistance in this context, we conclude that he cannot demonstrate a reasonable probability that the result in this case would have been more favorable to him in the absence of counsel's alleged errors. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052]; *In re Alvernaz* (1992) 2 Cal.4th 924, 945 [8 Cal.Rptr.2d 713, 830 P.2d 747]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].)

### 1. *Background*

Even though we limit our review of defendant's claim to the prejudice prong of the ineffective assistance of counsel inquiry, a brief review of Goldschieder's representation of defendant after the execution of his sentence is necessary to provide meaning to our analysis.

This background is gleaned from Goldscheider's testimony at the revocation hearing. At that time, Goldscheider had practiced primarily criminal and juvenile law for 20 years. It was his understanding that all of the prosecution's interviews with defendant after his sentencing were "pursuant to the agreement," and that defendant "had the obligation to speak under the agreement." Goldscheider "deliberately" did not contact defendant at CYA after he learned that Coretjer had told the district attorney that defendant had made incriminating statements. Goldscheider explained that he did not want to "taint" or "intercede[d] into the agreement" by communicating with defendant at that time. Since the agreement was still "operative," Goldscheider believed "that whatever occurred at that point" could not be used against defendant.

Goldscheider further testified, however, that he repeatedly conferred with Grandsaert about his investigation and pointed out that the witnesses against defendant had "credibility problems." Goldscheider said that he also reminded Grandsaert that defendant's April admissions still indicated he had not actively participated in the murder as an aider and abettor and that the agreement should, therefore, remain in effect. Goldscheider testified that he continued to keep abreast of the incriminating statements as they arose. When told of Jones's statements, he asked to attend the interview with him. Goldscheider was unable to attend the interview, however, because he was in court on another matter the day it occurred.

Goldscheider further testified that he hoped to salvage the agreement by modification to reflect a perjury charge so that defendant could maintain the benefit of his CYA commitment. When he learned that Grandsaert intended to revoke the agreement and resume criminal proceedings against defendant, he withdrew from representation due to a conflict of interest.

## 2. *The Merits*

Defendant first contends that, if Goldscheider had interceded immediately after learning of the potential breach, it is probable that "he would have been able to negotiate a new plea bargain agreement with a sentence far less onerous that the one ultimately imposed." Defendant's argument is the sheerest conjecture and, we believe, is contradicted by the facts.

It is true that Grandsaert expressed some desire to try to salvage the plea bargain agreement. However, this occurred prior to defendant's admission of the extent of his perjured testimony at Johnson's preliminary hearing and, particularly, admissions that he exchanged blows with Martin at a point when Johnson had broken off the attack and aided Johnson in dragging Martin to the room where he was finally killed. While the record does reflect that defendant's continued pattern of deception in his interviews contributed to the decision to seek revocation of the agreement, Grandsaert also explained to defendant that it was doubtful that he could be used as a witness at Johnson's trial because of his lies. In fact, defendant's lies were so extensive that Grandsaert determined that the case against Johnson had to be dismissed and refiled. Any negotiations to modify the plea bargain agreement would certainly have required that defendant provide a complete and truthful statement regarding the murder. Therefore, we must assume that defendant would have eventually told the prosecution at least as much as Grandsaert learned through the uncounseled interview process that occurred. In light of the extent of the perjured testimony admitted by defendant, his credibility as a witness was severely impaired. We do not find a reasonable

probability that the presentation of this information in one statement would have enhanced defendant's credibility in the eyes of the prosecution to the extent that the first plea bargain could have been salvaged on more favorable terms.

Defendant alternatively argues that, if Goldscheider had promptly counseled defendant regarding the breach and was thereafter unable to negotiate a modified agreement, he could have then urged defendant to refuse further interviews thereby depriving the district attorney of admissions that possibly could be used in a resumed prosecution of defendant.

First, any refusal to submit to further interviews with the prosecution would have constituted a breach of the agreement and surely led to an immediate breach hearing. Second, any negotiations undertaken regarding modification of the plea certainly would have included an interview with defendant in order to ascertain the whole truth and to test defendant's credibility. Therefore, defendant still would be in the position of admitting the extent of his perjury and participation in the murder. Again, there is simply no reasonable probability that Goldscheider's early intervention would have led to a different result.

Defendant's perjury and continuing lies served to place him in an untenable position where no reasonable probability existed that the more active assistance of counsel would have produced a different result. He breached his agreement and it was properly revoked. Defendant reaped the consequences of his own deceitful conduct and cannot shift the blame for what occurred to the alleged failings of his attorney.

## IV. Disposition

The judgment is affirmed.

Kline, P. J., and Phelan, J.,* concurred.

A petition for a rehearing was denied June 13, 1996, and appellant's petition for review by the Supreme Court was denied September 4, 1996.

---

*Presiding Justice of the Court of Appeal, First District, Division Three, sitting under assignment by the Chairperson of the Judicial Council.

APPENDIX

JAMES P. FOX, DISTRICT ATTORNEY
COUNTY OF SAN MATEO
JUVENILE UNIT
21 Tower Road
San Mateo, CA 94402
By:John L. Grandsaert, Deputy
Telephone: (415) 363-4636

FILED

OCT 16 1992

WARREN SLOCUM, County Clerk
C. _____
DEP.[illegible] CLERK

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO
IN SESSION AS A JUVENILE COURT

In the Matter of: )
) PETITION NO. 52095
)
TERRELL D. COLLINS, ) AGREEMENT
(DOB 10/24/74) )
)
a Minor. )
_____ )

The San Mateo County District Attorney's Office on behalf of Petitioner, the People of the State of California, and Terrell D. Collins ("the Minor"), agree that the following terms and conditions shall be binding upon both parties, and shall set forth the terms of the Minor's admission of guilt in the instant case.

1. The Minor, Terrell D. Collins, is presently charged in a Petition filed under Welfare and Institutions ("W & I") Code section 602 with one count of murder in violation of Penal Code section 187.

2. The maximum penalty for an adult convicted of first degree murder is twenty-five years to life in prison. For an adult convicted of second degree murder the maximum penalty is fifteen years to life in prison. For a juvenile found to have

committed murder, the maximum penalty is a commitment to the California Youth Authority until age twenty-five.

3. By the agreement and admission now being made, the Minor, Terrell D. Collins, will admit a new count of the petition, accessory to murder, in violation of Penal Code section 32. Count one of the petition, murder, will be dismissed. The penalty for accessory to murder is a maximum of 16 months, two years or three years in state prison, or, for a juvenile, confinement in the California Youth Authority.

4. The District Attorney's Office has made this agreement with the Minor because the Office believes, based on it's investigation of the case, that the Minor's only role in the murder was to follow the instructions of the other participant, Christopher Johnson. This belief has been corroborated by the Minor's agreement to take a polygraph examination, and his apparently truthful answers given at several polygraph examinations.

5. The Minor, because he is 17 years old, and because he was 17 years old when he was present at the scene of the crime charged, is not subject to imprisonment in the California Department of Corrections. He may, however, be committed by the sentencing judge to the California Youth Authority institutional system. If committed to the California Youth Authority by the sentencing judge, the Minor would be discharged from custody no the age of 23, and would probably be paroled well before that time. This decision regarding parole would be within the exclusive province of the California Youth Authority.

2.

6. By this agreement and admission, the People agree that because of the Minor's continuing cooperation with law enforcement pursuant to this Agreement, the People will not seek to have the Minor found unfit to be tried as a juvenile offender under Welfare and Institutions Code section 707. If the People had sought a finding of unfitness, and if the juvenile court had found the Minor unfit to be tried as a juvenile, then the Minor would have been tried as an adult for his offense. If found guilty after a jury trial, the Minor could have been sentenced to the California Department of Corrections. ~~Since however, Terrell Collins is a Minor, any sentence to the Department of Corrections would not have taken effect until he was at least 18 years of age. Prior to his reaching that age, the Minor would have been housed at the California Youth Authority.~~

7. The Minor, Terrell D. Collins, will fully cooperate with the San Mateo County District Attorney's Office and the Daly City Police Department in the investigation and prosecution of criminal offenses, including but not limited to the murder of Drew Martin. Terrell Collins' cooperation will include, but not be limited to, providing truthful and complete statements concerning the actions and criminal offenses of all persons involved in the murder of Drew Martin on or about May 21, 1992, including Christopher Johnson and himself. Further, Terrell Collins will remain available to law enforcement agencies during the investigation and prosecution of persons involved in the murder of Drew Martin, and will testify truthfully and completely in all criminal proceedings involving the murder of Drew Martin regardless of whether those proceedings occur before or after the

3.

dispositional hearing of the Minor in this case, and regardless of whether the proceedings involve an initial trial, a re-trial, should one become necessary, or a proceeding following trial.

8. It is understood and agreed that any commitment to the California Youth Authority or other juvenile institution resulting from the Minor's admission of guilt and pursuant to this Agreement is conditional upon the continued performance by the Minor of all of the terms of this Agreement. Should the Minor refuse to testify at any time, whether totally or partially, then, at the option of the San Mateo County District Attorney's Office, this entire Agreement may be declared null and void by that Office, and the Agreement will thereby be rendered null and void. Should the Minor at any time testify, pursuant to this Agreement, untruthfully, then this entire Agreement is null and void. The effect of nullification of this Agreement will be: (1) That the Minor will be deemed to have withdrawn his admission of guilt, (2) The original charge will be automatically reinstated with no limitation on possible sentence or degree of murder, (3) The Minor will be returned to San Mateo County to face prosecution on the original charge, and, (4) The District Attorney's Office will be free to seek a finding of unfitness against the Minor. The Minor waives his rights to a speedy trial with reference to the charge referred to herein.

9. The office of the San Mateo County District Attorney and its agents will make good faith efforts to provide for the physical safety and welfare of the Minor while he is incarcerated pursuant to this Agreement.

4.

Dated: _10/16/_

Terrell Collins
Terrell D. Collins
("Minor")

Dated: _10/16/_

Attorney for Minor

Dated: _10/16/92_

Attorney for the People of the
State of California