[No. C068893. Third Dist. Nov. 14, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JOANNA LORRAINE PETERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III, V and VI.

**COUNSEL**

A. M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MAURO, J.**—As part of a negotiated plea agreement, defendant Joanna Lorraine Peterson pleaded guilty to second degree murder and agreed to testify at the trial of her codefendant Scott Varner. Pursuant to the plea agreement, the trial court sentenced her to 15 years to life in prison.

Defendant testified at Varner's trial. Varner was convicted of first degree murder with special circumstances and sentenced to death. Following defendant's testimony, however, the prosecutor moved to vacate her plea agreement on the ground that the plea agreement was premised on the truth of her statements, but her false statements created the inference that she had not been an active participant in the murder. The trial court agreed that defendant had made materially false statements and vacated the plea. Thereafter, defendant pleaded guilty to second degree murder and robbery in exchange for a sentence of 17 years to life in prison.

Defendant now challenges the trial court's ruling vacating her plea, contending (1) the trial court applied the wrong standard of review and the ruling is not supported by substantial evidence; (2) judicial estoppel bars the revocation of the plea agreement; (3) collateral estoppel bars the revocation of the plea agreement; (4) the trial court erred in invalidating the plea agreement after the prosecution reaped the benefit of its bargain; (5) the ruling must be vacated because of judicial disqualification; and (6) the ruling violated defendant's substantive due process rights.

Defendant's contentions lack merit. We will affirm the judgment.

## BACKGROUND

Jeanette Mariedth was murdered on November 26, 2005. Defendant and Varner were charged with premeditated murder, second degree robbery, kidnapping for robbery, kidnapping for carjacking, and carjacking. The information also alleged various special circumstances, which if true made the murder punishable by death or by life in prison without the possibility of parole. Defendant was 17 years old and was living on the streets at the time of the murder.

On November 7, 2008, defendant entered a plea agreement in which she pleaded guilty to second degree murder in exchange for the dismissal of the remaining charges and a sentence of 15 years to life in prison. As part of the plea agreement, defendant agreed to testify fully and truthfully at all stages of Varner's trial and at any interview. The agreement was premised on a taped statement she provided the previous day, which she expressly affirmed was "true, correct, and complete." With respect to that taped statement, the plea agreement provides: "A material misrepresentation will be grounds for revoking this agreement and reinstating all charges contained in the Information, including enhancements."

## A

In the taped statement made on November 6, 2008 (the one expressly referenced in the plea agreement), defendant said that on November 26, 2005, she was at the Travel Inn with two individuals named Casey and Jasmine when Varner came in through the bathroom window around 7:30 or 8:00 p.m. He introduced himself as "Kevin" and was wearing a gold tracksuit and black gloves. Defendant left with Varner to obtain methamphetamine. They were behind the Ready Inn when Varner encountered a man named Brandon, with whom he fought after Brandon called him a child molester. During the fight, Brandon dropped a knife and Varner picked it up.

Defendant and Varner went to State Street to see a man named "Butch," from whom they intended to purchase methamphetamine, but he was not home. As they sat in the parking lot of the apartment complex to wait for Butch, Mariedth drove into the complex and began unloading her groceries. Varner asked her for a ride to the Shasta Lake area and Mariedth agreed to accommodate them after she unloaded her groceries. Defendant had seen Mariedth previously when defendant used to live nearby and had helped her with her groceries once, but defendant did not think Mariedth recognized her. She denied she or Varner entered Mariedth's home while they were waiting, and could not explain why the groceries were strewn all over the floor when the police arrived later.

When they got into Mariedth's car, Varner sat in the front passenger's seat and defendant sat in the backseat. As they approached Redding, Varner told Mariedth he had a gun and a knife and would kill her if she did not cooperate. Defendant thought that Varner intended to take Mariedth's car. Varner demanded money, Mariedth gave him $20, and defendant used the money to buy cigarettes for Varner at a Circle K store. Sometime later they stopped at an In-N-Out Burger for food.

Varner stated he wanted to visit his younger brother's gravesite in Whiskeytown. Enroute, defendant asked Varner if he intended to let Mariedth go,

but he did not reply. At the cemetery, Varner instructed Mariedth to back into an unpaved area next to a small ditch. Defendant got out of the car because she had to go to the bathroom; she went behind a bush. Varner took the car keys and left Mariedth in the car. He advised defendant they needed to kill Mariedth because she could identify them and he had an "outstanding warrant for parole . . . 'cause he broke his ankle bracelet." Defendant refused to help Varner.

When they returned to the car, Varner told Mariedth that he was going to kill her. Varner asked if her car seat headrest was removable and if she had any plastic bags. She responded in the negative to both questions. Varner crawled into the backseat, emptied the contents of a plastic bag he found there, placed the bag over Mariedth's head and began choking her. Mariedth was kicking and screaming, and she attempted to fight back. Varner pulled her in between the seats so that her hands could not get to the bag over her head, and punched her repeatedly in the face. Meanwhile, defendant was curled into a ball in the backseat.

Varner continued choking and hitting Mariedth for about 20 minutes until she stopped moving. Varner asked defendant to help him remove Mariedth from the car, but defendant refused until he threatened her with a knife. After they extricated Mariedth's body from between the seats, Varner rolled her into the ditch and covered her with bushes and a blanket. He looked around for evidence and put the plastic bag from Mariedth's head into the trunk.

Defendant drove the car when they left the cemetery because Varner said he did not know how to drive. They stopped at a Valero gas station where Varner emptied trash from the car into the parking lot. They returned to the Travel Inn and while Casey and Jasmine were sleeping, Varner took their CD (compact disc) player. Thereafter, while driving around, defendant and Varner encountered defendant's friend Matthew "Papa Bear" Miller and gave him a ride to buy gas. They picked up Sandra "Mama Bear" Miller and a gas can at the Millers' van. The Millers bought some gas at an am/pm store and then they all went shopping at Wal-Mart so that defendant could break a $100 bill. They dropped off the Millers at the gas station and continued on to find a drug dealer.

Varner insisted on driving, lost control of the car, and crashed into a pole. They abandoned the car, went to a friend's house and a few other places before going to Taco Bell for a meal. After eating, they hired a cab and went to Mariedth's apartment. They used Mariedth's keys to gain entry and told a neighbor who saw them that defendant was Mariedth's niece. Varner realized that his black gloves were missing and put on some latex gloves he found in the apartment. Varner went through Mariedth's jewelry box and stole some of

her rings. They were inside the apartment for about 10 to 20 minutes before law enforcement arrived. Varner left through a window and jumped over a fence. Defendant crawled out of the bedroom window and started walking down the street when she was apprehended.

During the interview defendant admitted that her DNA would be under one of Mariedth's fingernails. She suspected that her fingerprints were in numerous places in Mariedth's car because she had not been wearing gloves.

At the time, however, the prosecutor did not have the results of a DNA analysis performed on a pair of white cloth gloves found in the backseat area of Mariedth's car. For one of the gloves—identified as "G-34" in the DNA analysis—there was a primary female contributor of DNA inside and outside the glove, along with other low-level DNA types detected. Defendant was a match for the primary female contributor of DNA inside glove G-34, and she could not be excluded as the primary female contributor to the DNA outside glove G-34.

For the other glove—identified as "G-11" in the DNA analysis—defendant could not be excluded as the primary female contributor to the DNA inside the glove, and she was a match for the primary female contributor of DNA outside glove G-11.

The prosecutor also interviewed defendant briefly on July 7, 2009, during jury selection for Varner's trial. The prosecutor impressed upon defendant how important it was for her to be honest. Defendant related that she and Varner were looking for drugs the night they met up with Mariedth. She said she had only seen Varner once before, earlier that November. The prosecutor asked defendant if she had worn the white gloves found in Mariedth's car. Defendant said she had not, but she had moved them from the backseat to the floor behind the driver's seat when she entered the car and sat down. She stated Varner took Mariedth's rings from her apartment, not from her body. Defendant discussed how she knew the Millers, and she also discussed her assault and battery on a girl, which had resulted in defendant being declared a ward of the court.

B

Defendant testified at Varner's trial on August 11, 2009. She recounted going with Varner to get drugs, watching Varner fight with Brandon and obtain his knife, and waiting for the drug dealer at the apartment complex when Mariedth arrived. Defendant said Mariedth agreed to give them a ride and, while they were enroute, Varner threatened Mariedth with a knife and

demanded money. Mariedth complied and defendant used the money to buy cigarettes at a Circle K. They also purchased burgers at an In-N-Out Burger.

Thereafter, Mariedth drove to Whiskeytown and parked the car as instructed, and defendant and Varner exited the vehicle. Varner said they had to kill Mariedth because she would report them to the police, but defendant refused to participate. They both reentered the car—defendant in the back and Varner in the front—and he asked Mariedth if the headrest was removable. She replied it was not, he crawled into the backseat, found a plastic bag and dumped out the contents. Varner tried to suffocate Mariedth with the plastic bag, beat her about the face, and manually strangled her. It took about 20 minutes for Varner to kill Mariedth, during which time defendant was curled up in the backseat next to him.

Varner forced defendant at knifepoint to help him remove Mariedth's body from the car. Varner rolled the body into a ditch and defendant placed the plastic bag used to suffocate Mariedth in the trunk.[1] Defendant drove the car to a gasoline station, where Varner dumped out some of the trash from the car. They returned to the Travel Inn where Varner retrieved a CD player and CDs. Defendant and Varner were driving around when they encountered "Papa Bear" Miller. They offered him a ride to his van, where they picked up his wife, "Mama Bear," and then drove to a gas station to fill a gas container. Defendant gave "Papa Bear" some money for gas. The group went to a Wal-Mart store in Redding, made some purchases and then left in search of methamphetamine. Varner indicated that the Millers could not accompany them and he left them at a gas station. At that point, Varner got in the driver's seat and defendant the passenger seat. Varner lost control of the car and it crashed into a pole. Defendant gathered her purchases from Wal-Mart, her backpack and Mariedth's purse; Varner removed the keys from the ignition; and they abandoned the car.

A friend gave defendant and Varner a ride to a parking lot behind the Americana Hotel around 6:00 a.m. and then they returned to the Travel Inn. When no one answered the door, they went to Taco Bell and had something to eat. After that they hired a taxi to take them to South City Park. According to the taxi driver, defendant was wearing black clothing and Varner wore a gold sweatshirt. Varner and defendant went to Mariedth's apartment and used her keys to enter. A neighbor saw them and defendant said she was Mariedth's niece. Defendant felt ill and went into the bathroom and vomited. Varner rummaged through Mariedth's jewelry box and stole some rings, which he put in his pocket.

---

[1] In her taped statement on November 6, 2008, defendant said it was Varner who looked around for evidence and placed the plastic bag in the trunk.

Other evidence at trial indicated that, meanwhile, the police arrived at the accident scene where Mariedth's car was abandoned. Soon the Millers walked by. The Millers recognized Mariedth's wrecked car as the one they rode in with defendant and Varner. They told the police they had been passengers in the car and asked if they could get their gas can out of the trunk. When the police opened the trunk they found the bloody plastic bag used to asphyxiate Mariedth.

Later that morning, Mariedth's brother reported her missing. Sergeants Stainberg and Bokavich went to Mariedth's apartment to investigate at the same time that defendant and Varner were inside. After the officers knocked on the door, Varner left the apartment through the bedroom window. Defendant left through a different window and was apprehended by Sergeant Bokavich. Varner was apprehended later. At the time of Varner's arrest he was wearing numerous women's rings on his fingers. According to Mariedth's brother, one was a ring that Mariedth always wore and never removed.

At trial, defendant stated that she was told she was liable for Mariedth's death under a felony-murder theory even if she was not an active participant in the killing. Under the circumstances, she pleaded guilty to second degree murder to avoid a harsher sentence. Defendant denied wearing the white gloves found in the backseat of Mariedth's car. She could not explain how her DNA got inside the gloves. Police did not find defendant's fingerprints inside Mariedth's car, only outside on the rear passenger door.

Varner's defense attorney's questioning of defendant portrayed her as an inveterate liar. Defendant admitted she lied on the day of her arrest when she initially said she had been with a friend named Cody all night and denied being in Mariedth's car.[2] In fact, she told an elaborate story about sneaking out of the house to avoid Cody's mother because defendant did not get along with her. Defendant continued to deny any involvement until she learned Varner was arrested and that he said they had been in a traffic collision together, at which time her story changed. She told the interviewers that Varner picked her up driving his uncle's car, and she did not learn about what he had done to Mariedth earlier until after he wrecked the car and told her the whole story. Defendant told the interviewers that the only reason she had Mariedth's purse when she was arrested was because it had become entangled in defendant's backpack when she fled the apartment. When they told her that Varner had stolen some of Mariedth's property, defendant feigned surprise.

The interviewing officers advised defendant that they knew she was lying, at which point she blurted out that Varner had killed Mariedth. She claimed

---

[2] Defendant was referring to an interview on November 27, 2005, the date she was arrested. The plea agreement did not reference that interview.

that she knew where Mariedth's body was because Varner had told her. Thereafter, she altered her story again and admitted she was in the backseat during the murder. When the interviewer left the room, defendant began crying hysterically and said, "God help me" and "What did I do?" Defendant could not recall telling the police that the only reason she went along with the program was because she was falling in love with Varner.

Varner's attorney demonstrated inconsistencies in defendant's testimony about the circumstances and extent of her drug use, and how well she knew Mariedth, intimating that Mariedth gave them a ride because she knew defendant. He elicited that defendant had changed her pants after the murder, lied to the police about the clothing she was wearing at the time of the murder, lied at trial about the pants in violation of her plea agreement, and he intimated she only admitted to changing her pants after she learned there was no DNA evidence linking her to the murder.

Counsel queried why defendant did not get help at the Circle K when she heard Varner, whom she allegedly had known for only two hours, threaten Mariedth with a knife and gun. She could not explain why she did not tell the clerk and instead purchased cigarettes for Varner and for herself. In order to establish that defendant was flushed or blushing in response to his pointed cross-examination, counsel noted that defendant had red splotches on her throat and the top of her chest and asked if defendant had some sort of physical ailment. She denied that she did, but when counsel pressed her about whether it had happened before, she replied, "I usually get red right there when I go into a seizure."

Matthew Miller testified that when defendant and Varner picked him up in Mariedth's car, defendant told him the car was hers. She said her mom and aunt were helping her buy the car because she was living at home again, was working, and had been going to school. Miller, who was known as "Papa Bear" because he helped out street kids, was proud that defendant, who used to date his nephew, was doing better.

A recording of Varner's interview on the day he was arrested was played for the jury at trial. He stated that defendant knew Mariedth, but he did not. On the night in question, defendant and Mariedth picked him up in Mariedth's car near South City Park. Varner alleged that a male and female, whom he did not identify, struck, kicked and choked Mariedth. He claimed the female "gave the death blow" by "[s]tomping on her throat."

Varner subsequently stated the incident occurred because he "wanted [Mariedth's] car, so [he could] steal a gun so [he could] go fuckin' shoot the dude that hit [him] in [his] face." He indicated to Mariedth that he had a gun

so that she would take them where he wanted to go. Varner and defendant left the car at one point, hoping the victim would take the opportunity to run away and leave them the vehicle, but when they returned Mariedth was still there. While Varner and defendant were outside of the car, defendant said she wanted to kill Mariedth so he reentered the vehicle and placed her in a chokehold. He put a plastic bag over Mariedth's face and when she fought back, "home girl" began pulling Mariedth's hair and pulled her between the seats. He acknowledged punching Mariedth in an effort to "knock her out" as she struggled, but asserted that defendant strangled Mariedth and jumped on her. Varner was simply "trying to teach [defendant] how to do it." He also stated that defendant wore gloves, and suggested that she had placed the bag over Mariedth's head.

Varner told detectives that when he was arrested, he was wearing defendant's drawstring pants that she wore during the homicide. Defendant changed her pants when they were at the apartment. Varner wore a gold sweatshirt and pants during the homicide and changed clothes after fleeing Mariedth's apartment.

Gene Pringle testified that Varner and defendant knew each other for a month or two before the murder and had come to his apartment together on one occasion. Varner visited Pringle's home after the homicide and left Mariedth's keys with him. Pringle gave the keys to the police after seeing Varner's picture on the television news. A police investigator found gold sweatpants in the laundry room of Pringle's apartment complex. The investigator found a pair of black gloves on the back of one of the cars in the parking lot. Blood collected from the pants matched Mariedth's DNA profile and Varner could not be excluded as the contributor of DNA found on the waistband. Varner was excluded as contributing DNA to the interior of the black gloves and the exterior of one of the gloves. The source of the DNA on the other glove could not be determined.

According to the pathologist who performed the autopsy on Mariedth, the cause of death was manual strangulation and suffocation with a plastic bag, and her injuries were not consistent with having been stomped as Varner alleged. There were no abrasions or scratches on Mariedth's hands or neck, which was consistent with the assailant wearing gloves. The blood in the plastic bag from Mariedth's car trunk matched Mariedth's DNA profile.

In her closing argument the prosecutor conceded that defendant was a liar and murderer, but contended her testimony was unnecessary to convict Varner. The prosecutor argued, "The People's key witness in this case was Mr. Varner's interview that day, the DNA, the physical evidence, the videos. We could prove it without [defendant]."

The jury convicted Varner of the special circumstances murder of Mariedth, and he was sentenced to death.

### C

On April 22, 2010, after Varner's trial, the prosecutor filed a request for findings pursuant to the negotiated plea agreement with defendant. In the request for findings, the prosecutor asked the trial court to "make a finding as [to] whether or not [defendant] fulfilled her obligation under the 'Plea Agreement.'" The trial court (Judge Gallagher) held a hearing to consider whether it was appropriate for it to make such a finding without the prosecutor first making a determination that defendant had not met her obligation, and then petitioning the court to set aside the plea agreement.

At the hearing, the prosecutor stated that she believed defendant had made "no material misrepresentation that affected our trial and she was consistent with the prior statement she had given to the People. So, if it lies on the People to make that decision, we believe she's fulfilled her obligation." The prosecutor simply wanted to ensure, given the significance of the case, "that if there were any issues wherein the court felt that [defendant] was untruthful such that they would affect that verdict, we could have them ferreted out now." She noted that defendant had lied about the pants she was wearing, but this issue was litigated in Varner's motion for new trial.

The trial court indicated that defendant had testified falsely about several things and it doubted her credibility, but did not know if her falsehoods were material given that it did not have all of the information behind the plea negotiations. Thus, it could not make a ruling "at this point" because it would not be appropriate for the court to do so.

The prosecutor requested an opportunity to review the transcript of defendant's testimony and to compare it with the interview transcripts before filing a motion to have the plea nullified. She also asked the trial court to mention any ways it found defendant testified falsely.

The trial court observed that defendant was dishonest during the trial regarding her role in the killing, as "there was evidence that pointed toward her as being more deeply involved." The court said there was evidence that defendant (1) falsely denied wearing the white gloves found in Mariedth's car even though her DNA was inside them; (2) was not credible concerning her prior relationship with Mariedth and that they may have selected Mariedth as a victim based on this prior relationship; (3) lied about which pants she was wearing at the time of the homicide until she learned there was no DNA

evidence on the pants linking her to the homicide; (4) lied repeatedly to the police; and (5) was evasive and inconsistent about her prior drug history.

On June 4, 2010, the prosecutor filed a petition for withdrawal of the negotiated plea agreement. The plea agreement was premised on defendant's representation that she told the truth in her taped statement, but she falsely stated they would probably find her fingerprints in the car because she had not worn gloves that night. The prosecutor did not learn of the DNA analysis indicating that defendant was lying about wearing gloves until after the plea agreement was entered. The prosecutor reinterviewed defendant in July 2009 and expressly asked her whether she had worn the white gloves found in the car. Defendant denied that she wore them and said she simply moved them. The lie about wearing gloves was material because it indicated she participated in the assault on Mariedth.

Defense counsel argued defendant was not untruthful. Defendant consistently denied wearing the gloves and there was no evidence regarding the position in which the gloves were found. The gloves might have been inside out when defendant picked them up and moved them. Even if she had put them on, that would not lead to an inference of greater culpability because there was no blood on the gloves. Furthermore, defendant's misrepresentations were not material because they did not affect Varner's verdict.

The trial court disagreed with defense counsel's theory of materiality, indicating that the plea agreement was based on defendant being truthful about her own involvement as well as Varner's culpability. The trial court stated, "This . . . agreement was about [defendant] being honest about her own role in this crime, and . . . I'm convinced absolutely that she was not honest, and the DNA evidence found on the inside of the glove is more or less the lynchpin. It is the key critical piece of evidence that demonstrates that she wasn't honest, because as I . . . sat thinking about it during trial and realizing that this slow and torturous death of the victim run out over some lengthy period of time, minutes, obviously, that was an event in which there were multiple activities, potentially, by Mr. Varner and [defendant], some of which was strangulation, and it would have been opportune for [defendant] to have used those gloves to assist in the strangulation or assault on Miss Mariedth, and she didn't want to admit that, because it's apparent what that would have suggested. That would have subjected her to the greater risk of being found out about being an actual participant in the killing."

The trial court emphasized that the plea agreement "was about her being honest about her own role, start to finish, and I think it's the DNA evidence and . . . again, I know this may not be part of your consideration, but it certainly is a part of the trial process and part of the agreement, her other

admitted lies and those that I found just as the trier of fact on this issue cause me to believe that she did not live up to the plea agreement, that there were material misrepresentations during her testimony and . . . she is not entitled [to] the benefit of that bargain." Accordingly, the trial court ordered that the plea be vacated and set aside.

Thereafter, defendant pleaded guilty to second degree murder and robbery, in exchange for the dismissal of the remaining counts and for a total prison term of 17 years to life.

## DISCUSSION

### I

Defendant contends the trial court erred in vacating the plea agreement because (a) it used the wrong standard of materiality, and (b) there is no substantial evidence that defendant made a material misrepresentation.

### A

Defendant contends false evidence is "material" if it is of such significance that with reasonable probability it could have affected the verdict. (Citing *In re Malone* (1996) 12 Cal.4th 935, 965 [50 Cal.Rptr.2d 281, 911 P.2d 468], *In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527] and *In re Wright* (1978) 78 Cal.App.3d 788, 814 [144 Cal.Rptr. 535].) Defendant posits that under this standard, any misrepresentations made by her were not material because Varner was convicted. Defendant adds that in opposing Varner's motion for new trial, the prosecutor argued that defendant's misrepresentations were not material to the verdict.

The cited cases are of no assistance to defendant. They concern whether an imprisoned petitioner is entitled to habeas corpus relief based on false testimony at the petitioner's trial. (*In re Malone, supra,* 12 Cal.4th at p. 965; *In re Sassounian, supra,* 9 Cal.4th at p. 546; *In re Wright, supra,* 78 Cal.App.3d at p. 814.) The cases would apply to a habeas corpus petition filed by Varner, but do not limit the question of materiality in the present case. Instead, the question of materiality is governed by the terms of the plea agreement, which provided it could be revoked if defendant "violated any term of this agreement, including but not limited to the requirement to testify truthfully . . . ."

According to the agreement, defendant not only agreed to provide truthful testimony at Varner's trial but also warranted that her taped statement on November 6, 2008, was "true, correct, and complete." In fact, the agreement

provides that a material misrepresentation in her taped statement would be grounds for revoking the agreement. The plea agreement was based not just on her willingness to testify against Varner, but on her representations that she was not an active participant in the killing. Under the circumstances, defendant was obligated to do more than not tell material untruths about Varner's involvement in the murder, she was obligated to testify truthfully about her own involvement. The plea agreement could be vacated if the evidence demonstrated that her taped statement contained a material misrepresentation.

B

Defendant maintains there is no substantial evidence of a material misrepresentation because there is no evidence she lied about the extent of her participation or that she murdered Mariedth. In her view, the trial court's decision otherwise is based on speculation or conjecture. Not so.

" 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.] 'Deferential review is particularly necessary when, as here, the factual determination depends in part on judging a witness's credibility,' and we must uphold such a determination if it is supported by substantial evidence. [Citation.] 'We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.' [Citation.]" (*People v. Rabanales* (2008) 168 Cal.App.4th 494, 509 [85 Cal.Rptr.3d 607], original italics.) We must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, whether the evidence is direct or circumstantial. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [99 Cal.Rptr.2d 1, 5 P.3d 68].) If the circumstances reasonably justify the trier of fact's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Kraft, supra*, 23 Cal.4th at p. 1054; *People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

What defendant claims is speculation or conjecture is actually a reasonable inference from the evidence. The pathologist said there were no abrasions or scratches on Mariedth's hands or neck, which was consistent with the assailant wearing gloves. Two white gloves were found in the backseat area of Mariedth's car. Defendant's DNA was found inside one glove and she could not be excluded as the contributor of the DNA inside the other glove, which indicates defendant wore the gloves. Moreover, defendant's fingerprints were not found inside the car, which further supports an inference that

defendant was wearing the gloves in the car. This evidence supports a finding that defendant lied in her taped statement when she said they would find her fingerprints inside the car because she was not wearing gloves, and when she testified at trial that she did not wear the white gloves.

Defendant claims she moved the gloves while in the car, but this would only explain the presence of her DNA on the outside of the gloves, not the inside. Defendant argues the presence of DNA inside the gloves is not probative because there was no evidence regarding the state of the gloves, which could have been inside out when she moved them. However, defendant would have known if the gloves were inside out when she moved them yet she provided no such evidence, either at trial or in opposition to the motion to vacate the plea agreement. Varner's counsel expressly asked for an explanation for the presence of her DNA inside the gloves, but defendant did not provide one. And in response to questioning by the prosecutor, defendant denied putting on the gloves either because it was cold or in order to move the body.

Thus, there is nothing in the record to refute the reasonable inference that defendant's DNA was in one glove and possibly in the other because she was wearing them, and that she lied about doing so. In fact, defendant told a similar lie about the pants she was wearing at the time of the murder, claiming they were the same as the ones in which she was arrested. On cross-examination, she finally admitted she had changed clothes at Mariedth's house after the murder. Although defendant denied that she decided to be truthful only after she learned that Mariedth's DNA was not on the pants, a contrary inference is reasonable.

Defendant also lied about how well she knew Varner, falsely indicating she had just met him. She downplayed her relationship with Mariedth, stating she did not really know her. Knowing the two better than she claimed would support an inference that she was not merely an observer of Varner's actions that night, and that she helped target Mariedth based on defendant's prior contacts with her. It is noteworthy that defendant did not seek help at the Circle K or at In-N-Out Burger, even though at that point Varner had threatened Mariedth with a knife. Despite being an allegedly unwilling observer of the killing, during which she was curled up in a ball, defendant did not immediately distance herself from Varner in the aftermath. Instead, she dined at Taco Bell and burglarized Mariedth's apartment with him. Defendant lied to Miller about how she obtained Mariedth's car, claiming it was a gift from family members as a reward for her newfound responsibility. After she was apprehended, she repeatedly lied to the police about what had occurred, shifting her story as she learned they knew more than she thought. Defendant did not immediately tell them that she had unwillingly witnessed a murder.

■ When viewed in conjunction with the pathologist's testimony and defendant's other lies, her lies about the gloves and the pants created a reasonable inference regarding the true extent of defendant's participation in the murder. There was no reason for her to lie about the clothing she was wearing unless she was afraid they would link her to the murder if Mariedth's DNA evidence was on them. This supports an inference that she was an active participant and not just curled up in a ball during the killing as she claimed in her taped statement. Her falsehoods were material and warranted rescinding the plea agreement.

■ "The power of the court to set aside a plea bargain on the ground of breach by a defendant of its terms is beyond question. ' " 'A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound.' " ' [Citation.] 'When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement.' [Citation.]" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 533 [110 Cal.Rptr.2d 210].) The failure to hold the parties to the terms of their agreement would undermine the judicial process, and " 'courts have inherent authority to protect the integrity of the judicial process. [Citation.]' " (*Id.* at p. 534.)

The trial court did not err in setting aside the plea agreement.

## II, III[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

Defendant next contends the trial court improperly invalidated the plea agreement after the prosecution reaped the full benefit of its bargain. The prosecution was aware of the DNA evidence on the gloves prior to trial, yet chose to have defendant testify at trial anyway. Defendant argues that under the circumstances, her lies could not have been material or the prosecution would not have continued to use her testimony. And having used her testimony, it was unfair to invalidate the plea agreement.

Defendant relies on *People v. Brunner* (1973) 32 Cal.App.3d 908, 916 [108 Cal.Rptr. 501] (*Brunner*), *People v. Collins* (1996) 45 Cal.App.4th 849 [53 Cal.Rptr.2d 367] (*Collins*), *People v. Vargas, supra*, 91 Cal.App.4th at pp. 533–534 (*Vargas*), and *U.S. v. Vogt* (8th Cir. 1990) 901 F.2d 100 (*Vogt*), to

---

[*]See footnote, *ante*, page 1072.

.

support her contention that the prosecution received the benefit of its bargain. She appears to believe those decisions indicate that a defendant's falsehoods are only material if they deprive the prosecution of the ability to use the defendant's testimony at trial. We interpret the cases differently.

In *Brunner, supra*, 32 Cal.App.3d 908, the prosecution entered an oral immunity agreement with the witness regarding the murder of Gary Hinman by Robert Beausoleil. The witness, who admitted the full extent of her liability prior to entering the oral immunity agreement, testified against Beausoleil and he was convicted for the murder of Hinman. After the trial, she recanted her testimony, and then recanted her change of heart. (*Id.* at pp. 910–911.) She subsequently testified at the penalty phase in the trial of Charles Manson and various Manson family members for the Tate-LaBianca murders, where she denied participating in the Hinman murder. And at Manson's trial for the Hinman murder, she again denied participating in the murder. The prosecution introduced her testimony from the Beausoleil trial in which she incriminated Manson, and he was convicted of the murder. (*Id.* at p. 911.) Thereafter the grand jury indicted the witness for the Hinman murder. (*Id.* at p. 911.)

The appellate court upheld the trial court's ruling dismissing the indictment. (*Brunner, supra*, 32 Cal.App.3d at p. 917.) The prosecution failed to use the statutory procedure for immunity agreements, did not put the agreement in writing, and did not obtain court approval. (Pen. Code, § 1324.) This undermined the court's ability to determine if the witness had complied with the terms of the agreement. (32 Cal.App.3d at pp. 914–915.) The appellate court determined that the purpose of the immunity agreement was to obtain the convictions of the most reprehensible of the Hinman killers and this was achieved. Because the People obtained their hoped-for results through the use of the witness's testimony, the court concluded "albeit somewhat pragmatically, that enough of the bargain was kept to make it operative." (*Id.* at p. 916.)

 Here, unlike the immunity agreement in *Brunner*, the plea agreement was in writing and expressly stated that any material misrepresentations in defendant's taped statement would be grounds for revoking the agreement. And unlike in *Brunner*, the prosecution was not aware of the full extent of defendant's involvement at the time it entered the plea agreement because she lied to them. The materiality of her lie about the gloves did not become apparent until viewed with all her other lies at trial, including, but not limited to, her lies about the pants she was wearing during the murder, where she obtained Mariedth's car, and the extent of her relationship with Mariedth and Varner. All of these lies created an inference that she lied about the extent of her involvement in the murder. The prosecution should not be bound to a plea

agreement when a defendant hides her true culpability from them with lies that only become fully apparent at trial.

In *Collins, supra,* 45 Cal.App.4th 849, the court held the prosecution did not receive the benefit of its bargain and could rescind a plea agreement where the defendant admitted he lied at a codefendant's preliminary hearing, the codefendant's motion to dismiss was granted, the lie included the extent of his own involvement, and the prosecution could not use defendant's testimony at the second preliminary hearing. (*Id.* at pp. 856–860, 867–868.) In other words, the prosecution moved to vacate the plea prior to trial because it knew the defendant had lied and breached the plea agreement. The same is true of *Vargas, supra,* 91 Cal.App.4th at pages 532 to 536.

In *Vogt, supra,* 901 F.2d 100, the defendant underwent a polygraph test in which he admitted he lied to the prosecution, but the prosecution used his testimony thereafter anyway. (*Id.* at p. 101.) *Vogt* upheld the district court's ruling that although the defendant had materially breached the plea agreement, the government waived any right to complain when it continued to use the defendant's testimony after it learned of the breach. (*Id.* at pp. 101–102.)

Unlike in *Collins, Vargas* and *Vogt,* we cannot say that the prosecution was fully aware of defendant's breach of the agreement prior to her testimony at Varner's trial. Under the circumstances, there is no unfairness in the timing of the prosecution's posttrial motion to rescind the agreement.

Contrary to defendant's assertion, the prosecution did not receive the full benefit of its bargain. It matters not that Varner was convicted, because the bargain with defendant was premised on defendant telling the truth, not on a particular outcome in the Varner trial. Where a plea agreement obligates a defendant to make full and truthful disclosures, partial disclosure by a defendant may constitute a material and substantial breach, such that the prosecution is released from its obligations. (See *U.S. v. Wood* (11th Cir. 1986) 780 F.2d 929, 931–932; see also *U.S. v. Gonzalez-Sanchez* (1st Cir. 1987) 825 F.2d 572, 578; *U.S. v. Reardon* (10th Cir. 1986) 787 F.2d 512, 516.) The fact that the prosecution may have benefitted from a defendant's partial performance under the plea agreement does not bar the prosecution from moving to vacate the plea agreement based on a material and substantial breach of it. (*U.S. v. Britt* (8th Cir. 1990) 917 F.2d 353, 360.)

Here, the trial court found that defendant's misrepresentations about her involvement were material and a substantial breach of the agreement. Defendant's claim of error fails.

V, VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Raye, P. J., and Butz, J., concurred.

A petition for a rehearing was denied December 4, 2012, and appellant's petition for review by the Supreme Court was denied February 20, 2013, S207225.

---

*See footnote, *ante*, page 1072.